The State v. Grinstead.

No. 821.* (61 Pac. 975.)

1. CRIMINAL LIBEL — Innuendo — Inducement. Where, in all the counts of an information charging a criminal libel, matters explanatory of the publication, and necessary to be stated by way of inducement, are stated only by way of innuendo, and the offense is not complete from the publication itself, a motion to quash should have been sustained, since matters which should have been stated by way of inducement cannot be supplied by the innuendo.

*Dismissed by supreme court March 9, 1901. See 62 Kan. 868, 64 Pac. 55.—REP.

2. ―――― *Change of Venue—Ill Feeling of Judge.* Where defendant in a prosecution for criminal libel had, within a year prior to the trial, in a newspaper charged a judge with bribery in securing his election, and defendant made affidavit for a change of venue from the judge because of his bias and ill feeling towards defendant on account of such publications, and alleged that the judge would not speak to him because of his ill feeling towards him, it was error to refuse the change of venue, though the judge made affidavit that he entertained no ill feeling towards the defendant.

3. ―――― *Burden of Proof—Reasonable Doubt.* In a prosecution for criminal libel, it is only incumbent on the defendant to raise a reasonable doubt in the minds of the jury as to his participation in the alleged publication to secure an acquittal.

4. ―――― *Conduct of Public Officer—Instruction.* An instruction in a prosecution for criminal libel, that a publication against a public officer which imports a charge of unfitness to administer the duties of the office is libelous, is erroneous, since official conduct is a proper matter for criticism, within reasonable bounds.

Appeal from Doniphan district court; WM. I. STUART, judge. Opinion filed July 11, 1900. Reversed.

STATEMENT.

THIS is an appeal from a judgment of conviction upon an information charging libel in four different counts, based upon four different publications in a newspaper called the Wathena *Star*, of which the defendant was editor and publisher.

The article charged in the first count to have been published by the defendant is set forth in the information as follows:

"It would be hoped that no dirty scandals would attach to the present republican administration, and that a record would be made whereby we could march proudly before the people in the campaign of 1900. But here comes the asylum scandal along on top of the other dirty deals which it seems the managers of the administration have laid awake nights to conjure. That boodle was used in securing the location for

Parsons there is no question. One of the main things urged in the matter of the new asylum was that the building should be nearer access to the western portion of the state. A number of senators who had declared their intentions of voting for Clay Center as the site changed their minds and voted for Parsons, almost in the extreme east, where the other institutions were located. Our own dear Senator Fulton [meaning thereby the said John A. Fulton], who promised to support the Wathena high school, went square back on us, voted for Parsons on the asylum question, which was an open violation of his pledge. Senator Zimmer, one of the demo-pops, and a hobnobber of Leland and his gang in the judgeship contest, and who is looked on by the members of his own party as venal enough to sell his soul for a very small piece of filthy lucre, was into the play. He was also pledged to Clay Center as the location; but when it came to balloting, Zimmer, like traitor Fulton [meaning thereby the said John A. Fulton], went back on the whole thing and voted for Parsons, and Zimmer tore up the ballots, in the face of every honest member of the committee. Several of the senators had no knowledge that they were offered money for their votes. There is no question as to what John Fulton did [meaning thereby the said John A. Fulton]. This is the kind of cattle the Leland gang foist upon their party. Fulton [meaning thereby the said John A. Fulton], a man devoid of honor, character, or decency, representing this district in the senate, by the grace of Cy. Leland. A man who will sell out every constituent which he has while in public office is a sweet thing to Leland, and this is one of the glories of serving the boss."

The introductory part of the information is confined to an allegation that this publication was made by the defendant wilfully and maliciously, and the defendant thereby was contriving and intending to vilify and defame one John A. Fulton and provoke him to wrath, and expose him to public hatred and contempt and

The State v. Grinstead.

ridicule, and deprive him of public confidence and social intercourse; in short, a recital of the words of the statute. Sufficient innuendo is introduced to apply the statement of the publication to the defendant personally, and to elucidate the meaning of the several statements more fully than appears by themselves as asserted to be in fact; the pleader assuming, probably, that the words were libelous *per se*, and that no allegation of extrinsic facts was necessary. Hence there is no colloquium. The introductory part of the information avers that the publication was of and concerning the complaining witness, which is probably sufficient colloquium where the words are actionable or libelous *per se* and no allegation of extrinsic facts in support of the publication or explanatory thereof is necessary.

Without any explanatory allegation, the second count charges the defendant with having wilfully, unlawfully, and maliciously, contriving, etc., as in the first count, published of and concerning the said John A. Fulton the following:

"Senator Fulton rode on a pass and then charged up $52.38 as mileage while getting in his graft on the new asylum location, in which case he also very suddenly changed his mind in favor of Parsons, instead of Clay Center, after Parsons began paying $3000 for votes. This is the kind of a senator that graces the seat in this district by the grace of the king of Doniphan!"

This is followed by an innuendo attempting to give to the words the meaning attributed thereto by the complaining witness.

The third count of the information in the same way charges the defendant with having published of and concerning John A. Fulton the following: "John A.

6—10 KAN. APP.

Fulton got $3000 for his vote to betray the people in the location of the new asylum." This is followed by an innuendo setting forth the meaning attributed to the words by the complaining witness.

In the fourth count, with the same introductory matter, the defendant is charged with having published of and concerning John A. Fulton the following:

"If the legislature had not met until this fall, Cy. Leland's little traitor, boodle senator, John Asylums Fulton's pocketbook would not have been as fat by $3000, for juggling with the misfortunes of the insane."

This is followed by an innuendo attributing to the words the meaning charged to have been intended by the defendant in the publication. It will be observed that in neither of these counts is there an allegation of introductory matter charging that the words were published concerning the complaining witness in any official relation whatever; nor does it appear from the words themselves what official position or what transaction the words refer to, so that an intelligent person would know the meaning thereof unless he had acquired knowledge otherwise than from the information itself. The defendant moved the court to quash the information, upon the ground that it did not state facts sufficient to constitute a public offense, which was overruled. The defendant then filed his motion and petition for a change of venue, on the ground that the judge of the district court was so biased and prejudiced against him that he could not have a fair and impartial trial. The petition alleges as facts in support of the allegation of bias and prejudice the following:

"That one Cyrus Leland is the republican boss of Kansas and of Doniphan county; that Leland pro-

cured the nomination and election of the judge of the district court and has a great influence over him; that the defendant published a series of articles in his paper, the Wathena *Star*, reflecting severely on the conduct of said Leland and Judge Stuart in procuring and receiving said nomination and election; that the defendant being a republican, in the beginning of the campaign of Judge Stuart supported him, up to about the 20th of September, 1898; that in order to procure the support of the defendant and his paper Judge Stuart promised to pay the defendant the sum of fifty dollars, and did pay forty dollars thereof, and also promised to secure the defendant a share of the county printing of Doniphan county; that Judge Stuart failing to pay the balance of the fifty dollars, and failing to procure the county printing for the defendant, he refused to further support him for judge, and afterward supported Judge Stuart's opponent, one James Falloon; that Stuart and Falloon, after the election, had a contest before the state senate respecting said judgeship, said contest commencing about March 22, 1899; that the defendant appeared as a witness for Falloon and testified to said bribery by Judge Stuart, and also the bribery by Judge Stuart of Ewing Herbert, editor of the *Brown County World*, and of Bert Howard, editor of the Horton *Headlight*, and of Ray Arries, editor of the Robinson *Index*; that Judge Stuart testified to the contrary in the contest proceedings, but that the senate found him guilty of corruptly bribing those editors; that as a result of these matters the defendant and Judge Stuart became and were at the time of the hearing of the petition enemies, and that Judge Stuart refused and refuses to speak to or recognize the defendant.''

This petition is verified by the defendant's oath to the truthfulness of all the matters set out therein. Upon the hearing of this petition the defendant was examined orally, and testified in detail to all of the matters contained in the petition, and produced and offered in evidence several of the publications in his

paper alluded to therein, in which many charges of wrong-doing, dishonorable conduct and the particular acts of bribery mentioned in the petition are openly charged both to Judge Stuart and to Cyrus Leland. These matters were contained in publications made before the election and in publications made after the election and after Judge Stuart entered upon the discharge of his duties.

In opposition to the motion for a change of venue the state offered the affidavits of John H. Reese, John Norman, and J. W. McClellan. The substance of these affidavits is that they have been acquainted with Judge Stuart for more than two years, and have been frequently in his company and talked over the issues of the last campaign—that is, the campaign of 1898—and since the election have talked over matters connected with the campaign and with the judicial contest; that they never heard Judge Stuart speak in an unfriendly manner of the defendant, and they never heard any word or saw any act of Judge Stuart showing any prejudice or resentment against the defendant; and that, from their acquaintance with Judge Stuart and their knowledge of his character and disposition, they believe he is able to determine whether he has any prejudice or not against the defendant; and, for the same reasons, they believe the defendant can have a fair trial before him. Judge Stuart also made and filed in the case, upon the hearing of the motion, the following statement:

"The judge of this court never at any time stated to Grinstead that in return for his support for judge, that he, the judge of this court, would use his influence to get Grinstead a portion of the county printing; and that the said judge of this court never at any time said to Grinstead that he would give him fifty dollars or any other sum if he (the said Grinstead)

would support him for judge.   That the judge of this
court never asked said defendant at any time or at
any place if he thought that he (Stuart) had better
pay Arries twenty-five dollars, and no reply was ever
made by said defendant, as given in his testimony.
That said judge never said to said defendant, at any
time or place, that he would pay Arries any money
whatever, and never arranged for a meeting with
Mr. Arries at Wathena, at said defendant's office
in Wathena, at any time; that the judge of this
court never at any time or place had any con-
versation with, paid to said defendant the sum
of forty dollars, or any other sum, to secure
his support for said judge, for the office of district
judge.   The judge of this court never, at any time or
place, had any conversation with said defendant in
which he told said defendant that he would have to
give Ewing Herbert one hundred dollars, or any other
sum to get his paper to support him, and the judge of
this court never, at any time or place, told said de-
fendant that he had run a bluff on Bert Howard and
had him settled so that he would have to support him;
that at no time since the hearing of the contest case
has the judge of this court read, and never knew a
large portion of the articles which appeared in the
Wathena *Star*, and which have been offered in evi-
dence on the hearing of said motion; that others of
the articles which were published in the Wathena *Star*,
and which have been offered in evidence on the hear-
ing of this motion, the judge of this court had read,
but as they were published in the heat of the cam-
paign, the judge of this court did not attach any great
importance to them, and had and has no ill will or
prejudices against said defendant on account of them;
and the judge of this court has no ill will or prejudice
against defendant on any account whatever; that
while there has been no personal communication be-
tween said defendant and the judge of this court since
about October, 1899, that it has been because said de-
fendant and the judge of this court have lived in dif-
ferent towns, they were not much together, and the

judge of this court had no occasion or inclination to communicate in any manner with the said defendant, and took it for granted that said defendant had no occasion or inclination to communicate in any manner with the judge of this court.

WM. I. STUART, *District Judge*."

Thereupon he denied the petition for a change of venue. This hearing was had upon the petition for a change of venue on the 11th day of September, 1899. On the 5th of December, 1899, the case was called for trial, in the absence of the defendant; his recognizance was forfeited, and it was ordered that a bench warrant issue for his arrest. On the 6th of December, 1899, the case was tried to a jury, and resulted in a verdict of guilty upon each of the four counts. A motion for a new trial was denied. The court gave to the jury, among other instructions, the following:

"13. There is no dispute in the evidence in this case but that the defendant Pool Grinstead was, at the time the alleged libelous articles were published in the said Wathena *Weekly Star*, both editor and publisher of said paper; the law therefore presumes that such publications were by the authority of said defendant; and as to the counts of the information to which the defendant makes the defense that they were published without his knowledge and authority, and unless he has so satisfied you, you should return a verdict of guilty in this case, unless you believe from the evidence that such articles were true, and that they were published for justifiable ends."

"17. Any imputation against any person who is in the enjoyment of an office, either public or private, of honor, profit, or trust, which imports a charge of unfitness to administer the duties of the office, is libelous."

"21. A publisher of a newspaper is responsible for the matter in his paper, as though the same was inserted by himself or published by his express direc-

tion, unless it is shown by the evidence that he did not publish or aid or assist in such publication and did not know of the same.''

The following errors are assigned :

1. That the court erred in overruling the motion to quash. 2. That the court erred in denying the motion for a change of venue. 3. That the court misdirected the jury in material matters of law, and failed and refused to instruct the jury in matters of law as prayed for in writing by the defendant.

The requests for instructions are not embodied in the assignment or in any part of the brief.

Upon looking into the record, we find that the court refused to instruct the jury that malice was an essential ingredient of the crime, and further, that proof of the truth of the publication, and that it was published for justifiable ends, was a legal defense, under the constitution of the state.

*A. A. Godard*, attorney-general, *S. M. Brewster*, county attorney, *Baker & Bell*, and *Ryan & Reeder*, for The State.

*Harvey & Harvey*, for appellant.

The opinion of the court was delivered by

Mahan, P. J. : The motion to quash went to the entire information. If either count charged an offense the motion was properly denied. The supreme court of Massachusetts, in *Carter v. Andrews*, 16 Pick. 6, says :

"Whenever words have the slanderous meaning alleged, not by their own intrinsic force, but by reason of the existence of some extraneous fact, this fact must be averred in a traversable form, which averment is called the 'inducement.' There must then be a colloquium averring that the slanderous words were

spoken of or concerning this fact. Then the word 'meaning' or 'innuendo' is used to connect the matters thus introduced by averments and colloquia with the particular words laid, showing their identity and drawing what is then the legal inference from the whole declaration, that such was, under the circumstances thus set out, the meaning of the words used."

It is well-settled criminal law that an innuendo cannot take the place of such allegations of inducement. Mr. Bishop, in section 748 of his work on Criminal Procedure, in speaking of innuendo, says : "Its office is limited strictly to the explanation thus indicated ; for it cannot add to or change or explain the previous statements, which must be sufficient as to the facts attendant on the libelous publication, without drawing anything from the innuendo. It is not, therefore, a matter upon which evidence can be introduced to sustain it at the trial." The same rule is announced in State v. Atkins, 42 Vt. 252 ; 13 Encycl. Pl. & Pr. 88, 89.

In all of the counts of this information, by way of innuendo only, is stated matter explanatory of the publication, which was necessary to be alleged by way of inducement. The offense does not appear complete from the publication itself. In other words, the facts attendant on the publication, which were necessary to explain it and necessary to charge the offense sought to be charged by the information, are not well pleaded therein. This applies to all of the counts. For this reason the motion to quash should have been sustained.

We are of the opinion that the court abused its discretion in denying the defendant's petition for a change of venue. The facts alleged are sufficient to sustain the charge of prejudice. They are not denied, except that the presiding judge, in his statement, de-

nies that he bribed or attempted to bribe the defendant to procure his support at the preceding election. He explains, or attempts to explain, why he has not spoken to the defendant since the election. The fact, however, remains that within a year before the trial the defendant did charge the judge with bribery. This charge was made by a publication in his newspaper during the progress of the canvass. It was reiterated in the contest proceeding in March, 1899. These occurrences were too recent not to affect in some degree the feelings of the judge towards the defendant. He may have believed that he could act without bias or prejudice in the trial, but it would be an experiment dangerous to the rights of the defendant to permit him to make the effort.

It was error to give paragraph 13 of the instructions. It was not necessary that the defendant should prove to the satisfaction of the jury that he did not participate in the publication. It was only necessary for him to produce evidence sufficient to raise in the minds of the jury a reasonable doubt that he did so. The burden was upon the state as to this issue and it did not change. (*The State v. Wait*, 44 Kan. 320, *et seq.*, 24 Pac. 354; *The State v. Osborn*, 54 id. 473, 38 Pac. 572; *The State v. Child*, 40 id. 482, 20 Pac. 275.)

It was error to give paragraph 17 of the instructions. The court said in that instruction that any imputation against a person holding an office which imports a charge of unfitness to administer the duties of the office is libelous. It seems to savor of the old adage, that the king can do no wrong. If an officer is the servant of the people, his official conduct is a proper matter for criticism, within proper bounds; and a mere imputation of unfitness for the office is

not libelous *per se*, and this is the substance of what the court said to the jury. It follows that the court erred in denying the defendant's motion for a new trial.

The judgment is reversed, and the cause remanded for further proceedings in accordance herewith.

McELROY, J., concurring.

WELLS, J.: I concur in the judgment reversing this case on the ground that the court misdirected the jury, but dissent from the rest of the opinion.